[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 1940
This is an action for dissolution of marriage. It presents the question: What are the legally permissible consequences in a dissolution action of domestic violence and abuse where the marriage is a relatively short one and the victim of the abuse has a substantial estate of her own?
The parties were married on May 13, 1989; therefore, at the return date of the complaint the parties had been married just over five years. There are no minor children issue of the marriage.
The plaintiff, Mr. Burgos, is 45 years old and a lieutenant in the Waterbury Fire Department, having advanced to that position during the marriage. While he described certain neck and back problems and suffers from asthma, none of these health problems interfere with his ability to work. His present gross weekly income is $1,142, consisting primarily of his wages and including rent received from his daughter and Social Security disability benefits he receives on behalf of one of his sons.
Mrs. Burgos, the defendant, is 50 years old, and her health is not good. She is, however, currently employed on a part-time basis (30 hours a week) as an interpreter for hearing-impaired students in the Waterbury school system. Her gross weekly wage during the school year is $325, and she receives no income during the summer months from that source. She presently receives $180 per month in child support for her daughter from a prior marriage, and that payment will end in June 1997. She has no other sources of income, and her earning capacity is limited without additional education. Presently, she has only a high school degree and limited secretarial skills without any computer familiarity.
Excluding a minimal pension fund ($4,400), Mrs. Burgos' assets total $103,500. The court includes in this total the sum of $10,000 which was transferred to her daughter in Maine on the eve of this action. The court finds that that fund was accumulated during the marriage by Mrs. Burgos and, therefore, is part of the marital estate. Mr. Burgos' assets, on the other hand, total approximately $50,000, including two pieces of real property, one of them purchased during the marriage. He has a sizeable pension fund with the City of Waterbury, however, valued at approximately $53,000 at the time of trial. The CT Page 1941 parties have miscellaneous liabilities in the amount of $16,000 (Mrs. Burgos) and $8,000 (Mr. Burgos) not including amounts owed to their attorneys and mortgages Mr. Burgos must pay on his real property.
The court has considered all of the criteria of Sections46b-62, 46b-81 and 46b-82 of the General Statutes, together with the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account", Scherrv. Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than as stated subsequently in this memorandum. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman, 188 Conn. 232, 234 (1982). Suffice it to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding, Leo v. Leo, 197 Conn. 1, 5 (1985), and need not give equal weight to each factor. Kane v. Parry,24 Conn. App. 307, 313-14 (1991).
This was a short marriage of five long years. After the parties married, Mrs. Burgos and her 11-year old daughter took up residence in a home already occupied by Mr. Burgos and four of his children, ranging in age from 9 to 13. Mrs. Burgos' role was to take care of the home and all five children, and she did so willingly and capably. Mr. Burgos was the only source of income for the parties' joint expenses, and he paid some of Mrs. Burgos' individual liabilities from before the marriage.
While the parties' roles seem to have been clearly defined at this stage, from the testimony heard by the court, this was not a happy home. It was characterized by constant disagreements over money and the children, excessive efforts by Mr. Burgos to exert control over Mrs. Burgos and their children and, most importantly, a pattern of domestic violence by Mr. Burgos upon Mrs. Burgos, beginning shortly after the marriage and continuing until 1993. The atmosphere in the parties' household can be appreciated by reference to some of Mr. Burgos' attempts to control the lives of his wife and their children. On occasions he locked the kitchen and/or the refrigerator in order to control the consumption of food. At other times he disabled the cable system in order to control the use of the television Mr. Burgos claimed his constitutional privilege against self incrimination when asked whether or not he had taped phone calls CT Page 1942 in the household. In a civil case the court may draw an adverse inference from a claim of the self incrimination privilege, OlinCorp. v. Castells, 180 Conn. 49, 53-54 (1980), and the court does so in this case, especially in view of testimony from a witness that she had seen such taping equipment in the basement of the home in 1992 and heard recordings made by way of that taping equipment.
Mrs. Burgos claimed ten specific incidents of domestic violence by Mr. Burgos, and he acknowledged several of those incidents. The most violent occurred in November 1990 when it is fair to say that Mr. Burgos attacked Mrs. Burgos in a rage, knocking her down and stomping on her stomach. Mrs. Burgos was taken by ambulance to the emergency room and remained in the hospital for 17 days. The medical records concerning this hospital stay indicate that a significant portion of it may have been due to a flare-up of an existing gallbladder condition on Mrs. Burgos' part, and no testimony was introduced to explain the records. That Mrs. Burgos was hospitalized as a direct result of Mr. Burgos' violence toward her, and that that violence was part of a pattern that continued for several years is not open to question.
In addition to the physical violence perpetrated upon Mrs. Burgos, Mr. Burgos repeatedly engaged in vile name-calling, spit upon Mrs. Burgos on several occasions, told her often to "get out and go home" to Maine and objected to her pursuing education and employment outside the home because the original plan was for her to take care of his home and children. Indeed, his assault in November of 1990 interrupted Mrs. Burgos' current educational efforts, and she never was able to resume them. Mrs. Burgos testified that she wishes to return to school in order to obtain a degree necessary to advance in her present occupation.
The court does not doubt that some of Mr. Burgos' conduct was provoked by Mrs. Burgos. Her care of the parties' children was erratic and sometimes violent. She persisted in arguments over the course of several days. She blocked Mr. Burgos' exit from confrontations even though she had been advised by a counselor that such conduct on her part could exacerbate the confrontation. None of her conduct, however, justifies or explains the level of violence, intimidation and control which Mr. Burgos exerted throughout much of the marriage. CT Page 1943
Mrs. Burgos was terrorized by Mr. Burgos' conduct. Her feelings of self worth were destroyed. She was humiliated because much of his abuse occurred in the presence of the parties' children, and she testified that she began to believe the derogatory names which Mr. Burgos applied to her. As early as the summer of 1989 she frequently moved out of the home and went to live with friends because of her fear of Mr. Burgos.
Mrs. Burgos' testimony was supplemented by the testimony of Dr. Evan Stark, a qualified expert in battered woman's syndrome. Having interviewed Mrs. Burgos on several occasions and reviewed considerable documentation concerning the history of the parties, Dr. Stark concluded that Mrs. Burgos fit the profile of a battered woman throughout the marriage. Her experiences resulted in multiple injuries, the aggravation of existing health problems and caused chronic stress from living in such an abusive relationship. In turn, these problems lead to an abiding fear of the future and a loss of self confidence. All of these are related to her ability to continue to provide for herself and to maximize her earning capacity. As recently as the summer of 1995 Mrs. Burgos was hospitalized for three days because of depression and suicidal thoughts. She presently is in counseling to combat the lingering effects of her marriage to Mr. Burgos.
A credible witness, who has known Mrs. Burgos for 28 years, including the periods of both her marriages, described a person far different in terms of personality and outlook on life now than when she entered the marriage to Mr. Burgos. This witness described Mrs. Burgos as having had a "bubbly" personality and saw her now as being withdrawn, depressed and afraid to be alone.
What are the permissible legal consequences of this course of conduct by Mr. Burgos in the context of this dissolution action? Among other things, Mrs. Burgos asks for an award of lump sum alimony in the amount of $50,000. The Appellate Court in Martone v. Martone, 28 Conn. App. 208, 217-218 (1992), upheld an award of $15,000 in lump sum alimony, which seems clearly to have been intended as compensation for the husband's "conduct in brutally causing the breakup of this marriage". Id., 213. It seems unlikely that such an award could stand now in light of the Supreme Court's decision in Delahunty v. Massachusetts LifeInsurance Company, 236 Conn. 582 (1996). In Delahunty the court held that "a party can bring a postdissolution action claiming CT Page 1944 damages for misconduct that had occurred during the marriage". Id., 592. In the course of concluding that the dissolution action is not res judicata, thereby barring a subsequent tort action, the court found that "the judgment in a dissolution action does not provide direct compensation as such to a party for injuries suffered during the marriage". Id., 593. "Alimony is intended to provide economic support for a dependent spouse, and the division of marital property is intended to recognize and equitably recompense the contributions of the parties to the marital partnership." Id. For these reasons, finally, the court held that, "[t]ort actions and dissolution actions lack the duplication that the doctrine of res judicata was aimed at preventing". Id.
The court finds that the cause of the marital breakdown in this case was Mr. Burgos' course of conduct throughout at least four years of the parties' marriage. Nevertheless, in light ofDelahunty, the court does not believe that it can award lump sum alimony simply as compensation to Mrs. Burgos for her endurance of that conduct. At the same time the cause of the breakdown is a factor to be considered in determining the support payable by Mr. Burgos to Mrs. Burgos and what is an equitable distribution of the marital estate. As indicated above, the court need not give equal weight to all of the statutory factors; thus, in a proper case such as this one, the court can give added weight to the cause of the breakdown in deciding on its award of alimony and its distribution of property. Moreover, the court can consider the effects of a party's conduct on the other party in making its orders, Robinson v. Robinson, 187 Conn. 70, 72
(1986), and the facts of this case demand that the court do so.
Mrs. Burgos made substantial non-economic contributions throughout the marriage, see O'Neil v. O'Neil,13 Conn. App. 300, 311 (1988), and economic contributions as well since she became employed in 1991. It is true that Mrs. Burgos' assets, excluding pension benefits, considerably exceed Mr. Burgos', that her ability to work at her present occupation has not been affected substantially by Mr. Burgos' conduct, and that her financial condition has improved during the marriage. Nevertheless, the court finds that her earning capacity has been stunted, perhaps forever, by Mr. Burgos' conduct during the marriage. The consequence of this is that she requires additional education, supplemental income and a share in Mr. Burgos' pension benefits, as well as an equitable portion of the principal asset Mr. Burgos acquired during the marriage; viz., CT Page 1945 the condominium.
The court finds that it has jurisdiction, that the allegations of the complaint are proven and are true, and that the marriage has broken down irretrievably. Based on those findings, as well as the court's consideration of the testimony and exhibits introduced at trial, its observation of the witnesses and assessment of their credibility, the court enters the following orders:
 1. The marriage of the parties is hereby dissolved on grounds of irretrievable breakdown.
 2. As lump sum alimony, the plaintiff shall be responsible for paying the cost of the defendant's obtaining an Associate's or Bachelor's degree in a field chosen by her, not to exceed $48,000. The plaintiff's obligation shall not exceed the sum of $12,000 annually and shall not extend beyond June 30, 2001. The plaintiff shall make these payments directly to the defendant or to the educational institution chosen by the defendant, at the defendant's election, upon his receipt of periodic statements from the educational institution itemizing the cost of the education pursued by the defendant.
 3. The plaintiff shall pay to the defendant as periodic alimony the sum of $200 per week until June 30, 2001. Thereafter, he shall pay $1 per year until the death of either party.
 4. The defendant shall be entitled to 25% of the present value of the plaintiff's pension with the City of Waterbury. That is to say, at such time as the plaintiff retires and prior to his death, the defendant shall be entitled to monthly payments of $432 gross before taxes, 25% of the amount shown as the present value of the plaintiff's pension in Exhibit J. Counsel for the plaintiff shall prepare a domestic relations order sufficient to transfer that portion of the plaintiff's interest to the defendant. The court retains jurisdiction to make any modifications of this order in order to carry its intention into effect or to enter any alternative orders with the same purpose. In particular, counsel for the parties shall consider CT Page 1946 the tax consequences for this order for both parties to determine how their tax liabilities will be apportioned. If the plaintiff is required to pay federal income tax on the entire monthly pension award, the defendant's monthly payment shall be the amount stated above less 25% of the federal tax to be paid by the plaintiff.
 5. Within 30 days of the date of dissolution the plaintiff shall pay to the defendant $2,500 representing 50% of the equity in the real property located at 7 Mark Lane, Waterbury, as shown on the plaintiff's financial affidavit signed and sworn to on November 20, 1996.
 6. Except as otherwise provided herein, the parties shall be entitled to the assets shown on their respective financial affidavits submitted in November 1996. Likewise, the parties shall be responsible for the payment of the liabilities shown on their respective financial affidavits, and each party shall indemnify and save the other harmless from any liability on those obligations.
 7. The plaintiff shall pay counsel fees for the defendant in the amount of $5,000 directly to the defendant's counsel within 90 days of the date of dissolution.
/s/ Shortall SHORTALL, J.